IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Debra M.,[1]                                              No. 6:22-cv-01498-HZ

              Plaintiff,                        OPINION & ORDER

     v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

              Defendant.


Bruce Whitman Brewer
Law Offices of Bruce W. Brewer, PC
PO Box 421
West Linn, OR 97068

       Attorney for Plaintiff

Kevin C. Danielson
U.S. Attorney's Office
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

Katherine B. Watson
Social Security Administration
Office of the General Counsel
6401 Security Blvd
Baltimore, MD 21235

        Attorneys for Defendant

HERNÁNDEZ, District Judge:

        Plaintiff Debra M. brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). The Court affirms the Commissioner's decision.

**PROCEDURAL BACKGROUND**

        Plaintiff applied for DIB on June 28, 2018, and SSI on April 19, 2019, alleging an onset date of May 15, 2013, on her application for SSI and March 17, 2016, on her application for DIB. Tr. 377, 384-404.[2] Plaintiff's date last insured ("DLI") is December 31, 2018. Tr. 33. Her application was denied initially and on reconsideration. Tr. 188-89.

        On June 16, 2020, Plaintiff appeared with counsel for a hearing before an Administrative Law Judge ("ALJ"). Tr. 228. On August 11, 2020, the ALJ found Plaintiff not disabled. Tr. 237. The Appeals Council vacated the decision and remanded the case for the ALJ to (1) address Plaintiff's request to submit written interrogatories to the vocational expert and (2) evaluate whether a cane was medically necessary. Tr. 245-46. On June 22, 2021, Plaintiff appeared with counsel for a second hearing before the ALJ. Tr. 31. On July 28, 2021, the ALJ found Plaintiff not disabled. Tr. 42. The Appeals Council denied review. Tr. 1.

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record, filed herein as Docket No. 10.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on lumbar degenerative disc disease with facet arthrosis; cervical degenerative disc disease with spinal stenosis; fibromyalgia with IBS; osteoarthritis of the hands, feet, knee, and spine; persistent depressive disorder; generalized anxiety disorder; PTSD; plantar fasciitis; chronic obstructive sleep apnea with RLS; and chronic shoulder and Achilles tendonitis. Tr. 441. At the time of her alleged onset date in March 2016, she was 52 years old. Tr. 41. She has at least a high school education and past relevant work experience as a customer service coordinator and tutor. Tr. 40-41.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140–41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. *Id.*

In step three, the Commissioner determines whether the claimant's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform their "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141–42; 20 C.F.R. §§ 404.1520(e)–(f), 416.920(e)–(f). If the Commissioner meets their burden and proves that the claimant can perform other work that exists in the national economy, then the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity after her alleged onset date of March 17, 2016. Tr. 33. Next, at steps two and three, the ALJ determined that Plaintiff has the following severe impairments: "morbid obesity; fibromyalgia; right shoulder impingement syndrome; lumbar degenerative joint disease status post L4-5 microdiscectomy; cervical degenerative disc disease and stenosis status-post fusion and discectomy (C5-6); left knee osteoarthritis and chondromalacia patella, chronic pain syndrome; and Achilles tendinitis with plantar fasciitis." Tr. 34. The ALJ determined that Plaintiff's PTSD and depression were not severe. Tr. 34. Next, the ALJ determined that

Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. Tr. 35. At step four, the ALJ concluded that Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with the following limitations:

> [S]he can never climb ramps, stairs, ladders, ropes, and scaffolds. She is limited to frequent balancing, occasional stooping, with no kneeling, crouching, or crawling. She is limited to no exposure to hazards, such as unprotected heights or moving mechanical parts. She is limited to occasionally reaching overhead with her right arm. She is limited to frequent handling, fingering, and feeling bilaterally. She requires the option to ambulate in the workplace with a cane (however, her use of an assistive device will not affect her ability to lift/carry).

Tr. 36. Despite these limitations, the ALJ concluded that Plaintiff could perform her past relevant work. Tr. 40. In addition, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as "Receptionist," "Statement clerk," and "Appointment clerk." Tr. 41. Thus, the ALJ concluded that Plaintiff is not disabled. Tr. 42.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v.*

*Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's.") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ erred by (1) concluding at step two that her mental health impairments were nonsevere, (2) discounting her subjective symptom testimony, and (3) discounting the lay statement of her son, Justin Day. Pl. Op. Br., ECF 13. The Court concludes that the ALJ did not harmfully err and therefore affirms the Commissioner's decision.

## I.    Step Two Analysis

Plaintiff argues that the ALJ improperly concluded that her mental health impairments were not severe. Pl. Op. Br. 3-4. At step two, the ALJ determines whether a claimant's medically determinable impairment or combination of impairments is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522, 416.922. Step two is a *de minimis* screening device used to dispose of groundless claims. *Yuckert*, 482 U.S. at 153-54. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.'" *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). Thus, even a medical record that "paints an incomplete picture of [the claimant's] overall health during the relevant period" can be enough to show that an impairment is severe. *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005).

The ALJ found Plaintiff's PTSD and depression nonsevere. Tr. 34. He wrote:

> The medically determinable mental impairments, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to

perform basic mental work activities and are therefore nonsevere. This is consistent
with the state agency consultant opinions and the lack of significant abnormalities
during the examination with Dr. Whitehead[.]

Tr. 34. The ALJ found no more than mild limitations in the four broad areas of mental

functioning. Tr. 34. He wrote, "Self-assessed levels of anxiety and depression were regularly in

the mild range on the Generalized Anxiety Disorder Questionnaire and the Patient Health

Questionnaire with limited periods of more significant complaints." Tr. 34 (citing Tr. 781, 790,

795, 934, 958, 993, 1020, 1046, 1066, 1076, 1086, 1102). He also relied on state agency

consultants who found the mental impairments nonsevere. Tr. 34. The ALJ also noted that an

exam by Dr. Whitehead showed no difficulty with memory or concentration. *Id.* Plaintiff points

out that Dr. Whitehead found that Plaintiff met the DSM 5 criteria for depressive disorder and

PTSD and detailed symptoms of those conditions, such as panic attacks. Pl. Op. Br. 3. She also

points to her history of mental health treatment. *Id.*

On December 4, 2018, Dr. Whitehead performed a comprehensive psychodiagnostic

examination of Plaintiff. Tr. 1152-58. Dr. Whitehead described Plaintiff's mood as "pleasant,

mildly anxious and depressed." Tr. 1155. Plaintiff's memory and cognitive functioning were

normal. Tr. 1155. Dr. Whitehead diagnosed Plaintiff with Persistent Depressive Disorder with

anxious distress, early onset; and PTSD. Tr. 1156. She wrote that Plaintiff "has panic attacks

(twice a month), triggers, nightmares with depression and anxiety." Tr. 1156. Plaintiff also

reported "poor concentration and feelings of hopelessness at times." Tr. 1156.

On December 5, 2018, state agency consultant Sergiy Barsukov diagnosed Plaintiff with

depression, anxiety, and a trauma-related disorder, and deemed the impairments nonsevere. Tr.

183-84. The examination included reports from May 2016 through December 2018 that

generally described Plaintiff's mood as mildly anxious and depressed. Tr. 181. State agency

consultant Susan South came to the same conclusion on May 30, 2019, based largely on the same evidence. Tr. 220-21.

A review of Plaintiff's medical records shows that the ALJ erred in finding Plaintiff's mental health impairments nonsevere. In March 2016, Plaintiff presented with "reduced depression and anxiety since switching over to Citalopram," but still had "worrying and occasional panic." Tr. 794. Her mood was recorded as mildly anxious and depressed. Tr. 795. In April 2016, Plaintiff reported "somewhat reduced depression and anxiety." Tr. 789. Her mood was recorded as mildly anxious and depressed and frustrated. Tr. 790. In May 2016, Plaintiff reported increased depression related to the denial of her prior application for benefits and stated that her antidepressant was not working. Tr. 781. Her mood was recorded as anxious, depressed, and tearful. Tr. 781. In June 2016, Plaintiff reported "continued depression and anxiety." Tr. 1101. Her mood was recorded as anxious and depressed. Tr. 1102. In July 2016, Plaintiff reported "somewhat reduced depression." Tr. 1085. Her mood had improved over the past few weeks after she began taking Cymbalta and because she had the house to herself. Tr. 1085-86. Her mood was recorded as mildly anxious and depressed. Tr. 1086.

In August 2016, Plaintiff reported decreased anxiety and depression after spending time visiting family. Tr. 1075. Her mood worsened after she returned home. Tr. 1076. She expressed anxiety at the idea of going to a park or other places outside the home. Tr. 1076. Her mood was recorded as anxious and depressed. Tr. 1076. In September 2016, Plaintiff reported reduced depression and anxiety despite reducing her dose of Cymbalta. Tr. 1065. She spent more time out of her bedroom in the living room with the curtains open. Tr. 1065. She also reported "some increased tearfulness reactivity to minor stressors since the reduction," but also that her mood had been good. Tr. 1066. Her mood was recorded as mildly anxious and depressed. Tr. 1066. In

November 2016, Plaintiff reported that her depression and anxiety were "under fairly good control." Tr. 1045. She again reported increased tearfulness since she reduced her dose of Cymbalta. Tr. 1046. Her mood was recorded as mildly anxious and depressed. Tr. 1046.

In January 2017, Plaintiff reported "worsening depression and anxiety" due to an onset of plantar fasciitis limiting her mobility and starting use of a CPAP, which caused claustrophobic panic attacks. Tr. 1029. Her mood was recorded as anxious, depressed, and tearful. Tr. 1030. In February 2017, Plaintiff reported "some reduction in depression, anxiety, and tearfulness." Tr. 1019. The combination of mirtazapine and metformin was "working fairly well for her mood, tearfulness, and sleep." Tr. 1020. She also reported side effects from these medications, including excessive daytime fatigue, nausea, abdominal cramps, and diarrhea. Tr. 1020. Her mood was recorded as mildly anxious and depressed. Tr. 1020. In March 2017, Plaintiff reported that her depression, anxiety, and PTSD had improved since she started mirtazapine and duloxetine. Tr. 1013. In June 2017, Plaintiff reported reduced depression and anxiety. Tr. 1002.

In September 2017, Plaintiff reported "somewhat increased depression and anxiety related to recent triggering of her trauma history." Tr. 992. The trigger was "watching a show on TV that involved a conflictual marriage." Tr. 993. Plaintiff reported increased anxiety and irritability but no flashbacks. Tr. 993. She had nightmares about once a month but reported that she had "learned to manage them fairly well." Tr. 993. Her mood was recorded as anxious, depressed, and irritable. Tr. 993. In October 2017, Plaintiff's depression and anxiety were "fairly stable at baseline." Tr. 976. In November 2017, Plaintiff's depression was at baseline, but her anxiety and irritability increased, and her negative thinking patterns appeared to affect her distress level. Tr. 966. Her mood was recorded as anxious, depressed, and irritable. Tr. 967.

In January 2018, Plaintiff reported "continued depression and anxiety." Tr. 957. She also reported "excessive fatigue and lack of enjoyment in activities," as well as "fairly negative thoughts about her situation and experiences." Tr. 957. She stated that while she did not feel significantly depressed, she felt "emotionally 'blah'." Tr. 958. Her mood was recorded as anhedonic, anxious, and depressed. Tr. 958. In April 2018, Plaintiff reported a "fairly stable mood" but an anxiety level that was "somewhat elevated." Tr. 934. She reported intrusive thoughts or images of harm to her family or herself a couple of times a week. Tr. 934. She felt that Paxil and Wellbutrin were working well for her. Tr. 934. Her mood was recorded as mildly anxious and depressed. Tr. 935. In June 2018, Plaintiff reported "continued mild depression and anxiety" with "'ups and downs' . . . within the normal range." Tr. 937. She reported "having days with low motivation to engage in activities" but that this was not "as bad or as frequent as at last appointment." Tr. 937. In July 2018, Plaintiff reported elevated anxiety and depression related to transferring to a new primary care provider. Tr. 944. Her mood was recorded as anxious and depressed. Tr. 945.

The foregoing establishes that the ALJ erred in finding Plaintiff's mental health conditions nonsevere. While it is true that Plaintiff's mood was often recorded as only mildly anxious and depressed and she reported that her medication was helpful, her mood was *never* recorded as normal in any of the visit notes addressed above, and several times it was recorded as anxious and depressed. Further, the ALJ focused on these assessments without acknowledging the effects Plaintiff reported from her anxiety, depression, and PTSD. The visit notes show that Plaintiff expressed anxiety surrounding changes in her life such as transitioning to a new doctor and reported that her PTSD was triggered by a television show. Plaintiff reported to Dr. Whitehead that she sometimes suffered from panic attacks and nightmares. She also reported

nightmares to her regular provider, and expressed anxiety about going to a park. As for the opinions of the agency doctors, Plaintiff points out that they were conclusory and appear to be based only on excerpts from visit notes listing Plaintiff's anxiety and depression as mild. Pl. Reply 2-3, ECF 18. There was no acknowledgment of the effects of Plaintiff's conditions that were discussed in those visit notes. As stated above, step two is a *de minimis* screening device used to dispose of groundless claims. *Yuckert*, 482 U.S. at 153-54. Plaintiff's depression, anxiety, and PTSD clear this threshold.

Plaintiff argues that "the proper assessment of the mental impairments in step two would direct a finding that plaintiff was either unemployable or at least unable to engage in anything more than simple, routine, repetitive jobs." Pl. Op. Br. 4. She argues that this finding "rules out all past work and with a sedentary physical RFC plaintiff would 'grid out' under med-voc rule 201.14." *Id.* Plaintiff is mistaken. While the ALJ erred in finding Plaintiff's mental health impairments nonsevere, a finding that they are severe does not determine what limitations should be included in the RFC. Plaintiff's argument appears to conflate the step two analysis with the step four analysis.

Plaintiff argues that Defendant waived the argument that the ALJ's step two finding was harmless by failing to raise it. Pl. Reply 1. Although Defendant did not make the argument, the Court must consider whether the ALJ properly assessed Plaintiff's testimony about her mental health conditions in formulating the RFC because Plaintiff has raised the issue. *See* Pl. Op. Br. 4, 10. That necessarily entails considering whether the ALJ's finding at step two is harmless. As discussed below, the Court concludes that the ALJ did not err in his assessment of Plaintiff's mental health conditions in formulating the RFC. The error at step two is harmless.

II.    **Subjective Symptom Testimony**

Plaintiff argues that the ALJ improperly discounter her symptom testimony. Pl. Op. Br.

4-12. The ALJ is responsible for evaluating symptom testimony. SSR 16-3p, 2017 WL 5180304,

at *1 (Oct. 25, 2017). The ALJ engages in a two-step analysis for subjective symptom

evaluation. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (superseded on other

grounds). First, the ALJ determines whether there is "objective medical evidence of an

underlying impairment which could reasonably be expected to produce the pain or other

symptoms alleged." Id. (internal quotations omitted). Second, "if the claimant has presented such

evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and

convincing reasons in order to reject the claimant's testimony about the severity of the

symptoms." Id. (internal quotations omitted).

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient."

Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (quoting Lester v. Chater, 81 F.3d 821, 834

(9th Cir. 1995)). "An ALJ does not provide specific, clear, and convincing reasons for rejecting a

claimant's testimony by simply reciting the medical evidence in support of his or her residual

functional capacity determination." Brown-Hunter v. Colvin, 806 F.3d 487, 489 (9th Cir. 2015).

Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and

must explain what evidence undermines the testimony." Holohan v. Massanari, 246 F.3d 1195

(9th Cir. 2001); see also Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (The reasons

proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ

did not arbitrarily discount the claimant's testimony.").

Between 2003 and 2005, Plaintiff worked as a teacher to incarcerated youth. Tr. 86-87.

After that, she worked from home as a customer service representative for an online stationery

company for almost six years. Tr. 87-88. She testified that she could work at a desk or sit in her recliner and use a laptop. Tr. 88. She also took breaks. Tr. 88. At her hearing in 2021, Plaintiff testified that she stopped working because her irritable bowel syndrome (IBS) required her to use the bathroom many times a day. Tr. 91. She testified that because of her "daytime sleepiness [it] is very hard to concentrate and stay awake." Tr. 91. She stated, "I have a lot of problems with sitting and walking and anxiety and fibromyalgia. Some days I'm sick and I have to stay in bed. I have some days I'm okay." Tr. 91. Her good and bad days were not predictable. Tr. 91.

At her hearing in 2020, Plaintiff testified that sitting, standing, and walking "have all become more difficult because of my plantar fasciitis." Tr. 58. She testified that her IBS got worse, as did her anxiety and depression, and she had been diagnosed with sleep apnea. Tr. 58. She testified that she used to be able to concentrate more and focus better. Tr. 59.

Plaintiff testified in 2020 that she was taking Wellbutrin and Paxil for her anxiety and depression. Tr. 59. She stated that the medications had "kind of made me plateau." Tr. 59. She testified that she still got anxiety. Tr. 59. Plaintiff testified that her medications made her mood stable "except in the case of new situations in which I then get very anxious." Tr. 60. She testified that going new places or meeting new people would make her anxious. Tr. 60-61. She testified that her depression was stable. Tr. 66.

Plaintiff testified in 2020 that she could not do a sedentary job because of her "excessive daytime sleepiness" and "fatigue from the fibromyalgia." Tr. 61. She would take a one- to two-hour nap during the day during the relevant period. Tr. 73. She testified that if she sat for longer than 30 to 60 minutes, her back would start seizing up and cramping and her neck started hurting. Tr. 61. She would lie in her recliner three to four hours a day to avoid this pain. Tr. 74.

Plaintiff testified that she thought she would get anxiety if she had to be on the phone. Tr. 61. She testified that at her old customer service job, she spent about 45 minutes to an hour a day on the phone. Tr. 63. She testified that she did not think she could do that job anymore because of her daytime sleepiness and arthritis in her hands. Tr. 63-64. She testified that her hands became very stiff, which made it painful to type. Tr. 73. She also testified that she would need to use the bathroom two to three times in the afternoon "for sometimes 30 minutes" because of her IBS. Tr. 64-65.

Plaintiff testified that interacting with customers would cause her anxiety, which she described as "kind of a fear. I would get clammy, lose focus, feel scared, panicky." Tr. 65. She also testified that she got nightmares and intrusive memories. Tr. 66. Plaintiff also testified that her daytime sleepiness made it hard for her to focus and concentrate. Tr. 68. Her memory was poor, and she had a foggy feeling from her fibromyalgia. Tr. 68. She testified that she "did not deal with conflict at all very well" during the relevant period and struggled to adapt to changes in routine. Tr. 69.

Plaintiff testified at her hearing in 2021 that her daytime sleepiness and dizziness had gotten progressively worse. Tr. 94. She testified that these symptoms made it very difficult to look at a computer or read and that sometimes she fell asleep while eating. Tr. 94. She also testified that she currently used a cane and had also used one between 2016 and 2018. Tr. 94. She testified that she used the cane anytime she left the house, both currently and between 2016 and 2018. Tr. 94.

Plaintiff testified that on a typical day she would get up, make her bed, and have breakfast, then check her email. Tr. 92. She said that after that she would watch TV or paint or do a few small chores until she took her lunch medication and had lunch. Tr. 92. She testified

that her medication made her groggy, so she had to lie down. Tr. 92. She testified that she would

watch a movie or take a nap. Tr. 92. She testified that she would "pretty much stay in bed the rest

of the evening and watch TV until it's bedtime." Tr. 92.

In terms of chores, Plaintiff testified that she could clean the cat box, do dishes, make her

bed, do laundry, sweep, and clean the bathroom. Tr. 92-93. Plaintiff testified that she drove to the

doctor's office or the grocery store. Tr. 89. She went to the grocery store once a week or once

every two weeks and carried her own bags, but she made them "pretty light." Tr. 89-90. She

could put them in a cart, put them in the car, and unload them. Tr. 90. Plaintiff also testified that

during the relevant period, she could drive her granddaughter to preschool and pick her up, and

feed her dinner. Tr. 74.

The ALJ concluded that Plaintiff's testimony was "inconsistent with the lack of

significant objective findings, the fact that treatment has been essentially routine and/or

conservative in nature, and her reported good response to medication and behavioral

modifications." Tr. 37. He added that "the complaints of conditions such as hand arthritis and the

degree of limitation associated with irritable bowel syndrome, mental impairments, and various

sources of fatigue are not supported by the treatment record overall." Tr. 37. The Court considers

whether the ALJ properly relied on these grounds in discounting Plaintiff's testimony, then

addresses Plaintiff's other assignments of error.

A.      Efficacy of Treatment

Plaintiff argues that the ALJ erred in rejecting her testimony because her symptoms were

well-managed or she improved with treatment. Pl. Op. Br. 7-11. Relevant factors for the ALJ to

consider when evaluating symptom testimony include "[t]he type, dosage, effectiveness, and side

effects of any medication" the plaintiff takes to alleviate symptoms, as well as treatment besides

medication that relieves symptoms, and other measures used to relieve pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)-(vi). "[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability." *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017). *See also Kitchen v. Kijakazi*, 82 F.4th 732, 739 (9th Cir. 2023) (holding that the ALJ reasonably discounted the claimant's symptom testimony based on "a gradual improvement in his functioning with prescribed medication and psychotherapy sessions").

The ALJ found that Plaintiff's pain was "well managed with medication" and that "behavioral modifications such as avoiding spending time in bed improved symptoms and functioning." Tr. 39. Plaintiff counters that some of the techniques she used to manage her symptoms, such as resting and reclining, would prevent her from gainful employment. Pl. Op. Br. 7. Plaintiff asserts that the ALJ did not address either her testimony that she needed to nap one or two hours per day or her need to recline a total for three to four hours per day. *Id.* at 6 (citing Tr. 73-74). Plaintiff also asserts that while the ALJ questioned her daytime sleepiness, he did not address her need to recline as distinct from her need to nap. *Id.* at 8.

The ALJ did not err in concluding that Plaintiff's chronic pain improved with medication. Plaintiff repeatedly reported to her providers that her chronic pain, including pain from fibromyalgia and her lumbar and knee pain, improved with changes in medication or was stable and well-managed with medication during the relevant period and beyond. Tr. 784 (April 2016), 1089 (July 2016), 1079 (August 2016), 1069 (September 2016), 1049 (November 2016), 1007 (June 2017), 996-97 (September 2017), 934 (April 2018), 941 (July 2018), 1125 (August 2018), 1344 (June 2019), 1324 (October 2019). While Plaintiff did not report that her pain was gone, the ALJ reasonably concluded that her pain was not as limiting as alleged.

The ALJ reasonably concluded that Plaintiff's knee pain improved with physical therapy. Tr. 38. In late November 2018, Plaintiff reported that she hyperextended her left knee and had been experiencing pain and buckling for a week. Tr. 1146. After completing physical therapy in May 2019, Plaintiff reported a 90% improvement in symptoms. Tr. 1217. She had a non-antalgic gate and walked without an assistive device. Tr. 1217. She felt that she had made good progress toward her goals of performing activities of daily living without pain, improving her quality of sleep, and returning to activities such as walking in the neighborhood and playing with her granddaughter. Tr. 1217.

The ALJ did not err in concluding that the degree of symptoms Plaintiff alleged from her mental health conditions was not supported by the treatment record. Tr. 37. He relied on the same analysis he relied on in assessing the severity of those conditions. Tr. 37. While that analysis was not sufficient to find Plaintiff's mental health conditions nonsevere, it is sufficient at this stage of the analysis. As discussed above, the ALJ correctly stated that Plaintiff's self-assessed levels of anxiety and depression were generally mild, with limited periods of more significant complaints. Tr. 34. The treatment notes reflecting those mild self-assessments also show that Plaintiff reported that her medications for her mental health conditions were effective. Substantial evidence supports the ALJ's conclusion that Plaintiff's limitations from her mental health conditions were less severe than she claimed.

The ALJ also reasonably discounted Plaintiff's testimony about her daytime sleepiness. The ALJ stated that "her self-report of symptoms through the Epworth Sleepiness Scale indicate she had only mild excessive daytime sleepiness." Tr. 38 (citing Tr. 1229, 1248). In August 2017, Plaintiff's Epworth score was recorded as "8 - Normal." Tr. 1278. In May 2019, Plaintiff's Epworth score was 11, indicating mild excessive daytime sleepiness. Tr. 1248. She reported a

high chance of dozing while sitting and reading or lying down to rest in the afternoon and a moderate chance of dozing while watching TV or when setting quietly after a lunch without alcohol. Tr. 1248. She reported a slight chance of dozing as a passenger in a car for an hour without a break. Tr. 1248. She reported no chance of dozing while sitting inactive in a public place, while sitting and talking to someone, or while sitting in a car stopped in traffic for a few minutes. Tr. 1248. Based on these answers, which show a higher likelihood of dozing only while engaged in passive activities or situations where one is not expected to pay attention, the ALJ reasonably concluded that Plaintiff's daytime sleepiness was not so excessive that it would prevent her from working. The ALJ reasonably discounted Plaintiff's testimony about worsening daytime sleepiness. Plaintiff's reported Epworth score in March 2020 was 12, similar to the 2019 score. Tr. 1230.

The ALJ reasonably concluded that Plaintiff's sleep problems improved with medication and use of a CPAP, despite imperfect CPAP compliance. Tr. 38. In March 2016, Plaintiff reported ongoing daytime fatigue, possibly related to either her medications or sleep apnea. Tr. 794. She was referred to a sleep study and began working with the sleep center. Tr. 797, 780. In May 2016, she was diagnosed with severe obstructive sleep apnea. Tr. 1222. In June and July 2016, Plaintiff identified restless leg syndrome (RLS), neuropathy, an uncomfortable mattress, and an increased dose of Cymbalta as causes of poor sleep. Tr. 1102, 1090. After she began taking duloxetine in the morning, she reported improved sleep in August 2016. Tr. 1079. She also reported having the best sleep in a long time when she visited her mother and slept on an elevated air mattress. Tr. 1076. In November 2016, she reported that taking zolpidem and changing her sleep position also improved her sleep. Tr. 1049.

Plaintiff began using a CPAP in January 2017, and initially reported a claustrophobic panic reaction from the CPAP mask. Tr. 1030. Her doctor discontinued Ambien and replaced it with mirtazapine, and in February 2017, Plaintiff reported that her sleep was improved and she was tolerating the CPAP much better. Tr. 1019. In March 2017, she reported that her fatigue was resolved and that RLS was the main issue. Tr. 1014. She was prescribed ropinirole. Tr. 1013. In June 2017, Plaintiff reported that the ropinirole had controlled her symptoms of RLS and her sleep quality had improved significantly. Tr. 1007. In August 2017, she reported that when she used the CPAP for more than four or five hours per night, she felt more refreshed in the morning and less tired during the day. Tr. 1278.

In January 2018, Plaintiff reported that she had fatigue all day long and was falling asleep despite using the CPAP. Tr. 958. Her provider discussed sleep management strategies and set the goal of using the CPAP all night instead of just three or four hours per night. Tr. 953. Her provider believed the inconsistent CPAP use was contributing to the fatigue and noted that Plaintiff had not tried some of the sleep strategies previously discussed. Tr. 954. In April 2018, Plaintiff reported that her sleep had improved, but she still was not wearing the CPAP all night. Tr. 1258. She denied insomnia at her appointment. Tr. 1259. In July 2018, Plaintiff reported that Remeron (mirtazapine) was working well to treat her insomnia. Tr. 1119.

In March 2019, Plaintiff again reported that she was sleeping well on mirtazapine. Tr. 1174. She reported ongoing fatigue but also that the CPAP helped with sleep. Tr. 1174. In May 2019, her provider recorded that Plaintiff used her CPAP four or more hours per night only 32% of the time, and found this usage rate inadequate Tr. 1248. Her provider believed Plaintiff's daytime sleepiness was due to inadequate control of her apnea. Tr. 1248. In July 2019, Plaintiff reported that when she used her CPAP longer, she had a bit more energy throughout the day. Tr.

1243. She was using her CPAP more than four hours per night 51% of the time. Tr. 1243. In November 2019, Plaintiff reported that her sleep had been great, seven to eight hours with CPAP. Tr. 1322.

In January 2020, Plaintiff reported issues with daytime sleepiness, and her provider referred her to the sleep center because her CPAP might not be at goal. Tr. 1319. In March 2020, Plaintiff's provider recorded that Plaintiff had ongoing benefit from CPAP and should continue it indefinitely. Tr. 1229. Plaintiff used her CPAP four or more hours per night 69% of the time. Tr. 1229. She reported ongoing daytime sleepiness, which her provider believed was due at least in part to less frequent use of the CPAP. Tr. 1230. In May 2020, Plaintiff reported that her sleep was stable on mirtazapine. Tr. 1315. In October 2020, Plaintiff was advised not to drive or operate heavy equipment until her daytime sleepiness was adequately treated. Tr. 1409. In May 2021, her provider wrote that Plaintiff's poor compliance with CPAP had led to recurrent symptoms of daytime somulence and decreased energy. Tr. 1418.

The foregoing records support the ALJ's conclusion that Plaintiff's sleep medications were effective. They also support the ALJ's conclusion that Plaintiff benefited from using CPAP despite being at less than full compliance. The ALJ did not err in concluding that Plaintiff's sleep problems would improve with adjustments to her CPAP and medications. Tr. 38. The ALJ also properly noted that Plaintiff was not fully compliant with her prescribed CPAP treatment. *See* 20 C.F.R. §§ 404.1530, 416.930.

Plaintiff argues that the ALJ's reliance on the Epworth score was erroneous insofar as it was intended to discount testimony about her fatigue from fibromyalgia. Pl. Reply 11. But the records show that Plaintiff's providers believed that Plaintiff's daytime sleepiness and fatigue were due to her sleep apnea, which could be addressed with greater CPAP compliance. The ALJ

could reasonably rely on that evidence. And as discussed above, the ALJ reasonably found that Plaintiff's fibromyalgia was well-controlled with medication. The ALJ reasonably concluded that Plaintiff's daytime sleepiness and fatigue were less severe than alleged and that Plaintiff had treatment available to improve her symptoms.

The ALJ did not err in concluding that behavioral modifications such as spending less time in bed improved Plaintiff's symptoms. Tr. 39. In August 2016, Plaintiff reported that she had a good visit with her mother but felt more down since she returned home. Tr. 1076. She reported spending most of her time in her dark bedroom. Tr. 1076. Her provider wrote that this likely contributed to distress and chronic pain. Tr. 1075. Plaintiff reported stress at the idea of going to a park. Tr. 1076. In September 2016, she reported more positive thinking with journaling and spending time out of her bedroom. Tr. 1065. She spent time in the living room with the blinds open. Tr. 1065. She went outside sometimes, but not every day. Tr. 1066. In February 2017, Plaintiff was spending most of the day in bed, which her provider believed exacerbated her pain and RLS. Tr. 1019. Plaintiff was either lying down or sitting in bed. Tr. 1020. In June 2017, Plaintiff reported that she was working on spending less time in bed. Tr. 1002. Her depression and anxiety were reduced, and her pain was stable. Tr. 1002. From this evidence, the ALJ reasonably concluded that Plaintiff's mental health symptoms and pain were alleviated with behavioral modifications such as spending less time in her bed and her bedroom.

In sum, based on Plaintiff's reports to her providers of the effectiveness of her pain medications, the ALJ reasonably discounted Plaintiff's testimony about her chronic pain, including pain from fibromyalgia and her back and knee issues. This serves to discount Plaintiff's testimony that she needed to recline for three to four hours per day to avoid neck and back pain. While Plaintiff argues that she needed to recline to control the pain, Pl. Op. Br. 7,

substantial evidence supports the ALJ's finding that her pain was not as severe as alleged. Based on the effectiveness of Plaintiff's treatment, as well as her self-reports of sleepiness to her providers, the ALJ reasonably discounted Plaintiff's testimony about the degree of daytime sleepiness and fatigue she experienced during the relevant period. This serves to discount Plaintiff's testimony that she needed to nap for one or two hours per day. And because Plaintiff testified that her issues with memory and concentration were due to her daytime sleepiness and fatigue, the ALJ reasonably discounted that testimony as well.

Plaintiff argues that because the ALJ failed to include her testimony about her need to nap and recline in his paraphrased version of the testimony, "he rejected it *sub silentio* instead of relying on clear and convincing reasons for doing so." Pl. Op. Br. 6. Defendant counters that "Ninth Circuit cases 'do not require ALJs to perform a line-by-line exegesis of the claimant's testimony.'" Def. Br. 10 (citing *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020)). Defendant also argues that the ALJ's reasoning "can 'reasonably be discerned.'" *Id.* at 11 (citing *Molina*, 674 F.3d at 1121). Defendant is correct. In addressing Plaintiff's "testimony regarding pain and discomfort," the ALJ cited evidence that Plaintiff's pain was well-controlled with medication and improved when she spent less time in bed. Tr. 39. Plaintiff's testimony about the need to recline was testimony about pain and discomfort. Tr. 74. The ALJ's reasoning in rejecting this testimony can be reasonably discerned. As for napping, the ALJ rejected Plaintiff's allegations of extreme fatigue and excessive daytime sleepiness based on self-reports of mild excessive daytime sleepiness and effective treatment. Tr. 38. This shows that he discounted her testimony that her sleepiness and fatigue were severe enough that she needed to nap one or two hours per day. In sum, the ALJ did not err in rejecting Plaintiff's symptom testimony based on the efficacy of treatment.

B.      Conservative Treatment

Plaintiff argues that the ALJ erred in discounting her testimony based on conservative treatment. Pl. Op. Br. 8-9. "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Smartt v. Kijakazi*, 53 F.4th 489, 500 (9th Cir. 2022) (internal quotations omitted). *See also Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) (physical conditions treated with over-the-counter pain medication); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (physical conditions treated with "physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset").

Plaintiff appears to argue that the ALJ found treatment of her spinal impairments, fibromyalgia, and chronic pain syndrome conservative. Pl. Op. Br. 8-9. But the ALJ only referred to conservative treatment with respect to Plaintiff's musculoskeletal conditions. Tr. 37-39; Def. Br. 13. As discussed above, the ALJ relied on Plaintiff's self-reports and the efficacy of treatment in discounting Plaintiff's testimony about symptoms from her fibromyalgia and chronic pain syndrome. Tr. 38-39. The Court therefore addresses Plaintiff's argument about conservative treatment with respect to her musculoskeletal conditions.

The ALJ stated, "There has been no recommendation for anything beyond conservative treatment of the musculoskeletal impairments." Tr. 38. He concluded that Plaintiff did not appear to need a cane. Tr. 38. He noted that Plaintiff "was advised to use ice and elevation to relieve any left knee discomfort and to return for treatment only as needed." Tr. 39.

In arguing that her treatment was not conservative, Plaintiff points to her prior spinal surgeries, asserting that surgery is not conservative. Pl. Op. Br. 8. Defendant counters that "Plaintiff did not have spinal surgery during the relevant period." Def. Br. 12-13 (citing Tr.

1107). In *Smartt*, the claimant had spinal surgery, followed by "physical therapy, temporary use of a neck brace and wheelchair, and ongoing pain medication." 53 F.4th at 500. The Ninth Circuit held that while the surgery itself was not conservative, the follow-up treatment was, and the ALJ reasonably found that conservative treatment inconsistent with the claimant's allegations about her symptoms. *Id.* Here, the ALJ acknowledged Plaintiff's history of cervical surgery. Tr. 37. That surgery is not a basis to deem her treatment during the relevant period not conservative.

Plaintiff testified that if she sat longer than 30 to 60 minutes, her back would start seizing up and cramping and her neck started hurting. Tr. 61. The ALJ recognized that Plaintiff had made some complaints of neck and back pain during the relevant period. Tr. 37 (citing Tr. 1107-12, 1174-75). In May 2016, Plaintiff's provider recorded "increasing lower back pain and radicular symptoms as noted with abnormal physical exam." Tr. 1107. Plaintiff reported that the pain had "radiation/numbness into left leg" and that it felt "similar to prior to her previous surgery." Tr. 1108. Several tender points were noted. Tr. 1109. The ALJ relied on a March 2019 treatment note stating that Plaintiff "[c]ontinue[d] with back and neck pains controlled on current meds." Tr. 1174. Whether this is viewed as conservative treatment or efficacy of treatment, the ALJ did not err in finding that Plaintiff's back and neck pain was controlled with medication.

The ALJ properly found treatment of Plaintiff's knee conservative. He reasonably noted that after physical therapy in early 2019, Plaintiff reported 90% improvement, to the point that she had a non-antalgic gate and could walk without an assistive device. Tr. 38 (citing Tr. 1217). The ALJ reasonably concluded based on this that Plaintiff's knee pain was not as disabling as she claimed. At her hearing in 2021, Plaintiff testified that she currently used a cane and had also used one between 2016 and 2018. Tr. 94. She testified that she used the cane anytime she left the house, both currently and between 2016 and 2018. Tr. 94. The ALJ reasonably discounted this

testimony by noting that Plaintiff only sometimes used a cane when she went to medical appointments. Tr. 35-36, 38-39. *See also* Def. Br. 7 (citing Tr. 35, 38, 1028, 1035, 1040, 1050, 1142, 1352, 1374). The ALJ reasonably relied on evidence that Plaintiff repeatedly displayed a normal range of motion in 2020 and 2021. Tr. 38 (citing Tr. 1419, 1427, 1429). He also reasonably relied on Plaintiff's improvement with physical therapy. The ALJ did not err in finding that a cane was not medically necessary. Despite finding that a cane was not medically necessary, the ALJ included a provision for use of a cane in the RFC. Tr. 39. He also limited Plaintiff to sedentary work. The ALJ did not err in his assessment of Plaintiff's knee pain.

Plaintiff argues that "no evidence exists that effective and less conservative treatment was offered or available." Pl. Op. Br. 8 (citing *Regennitter v. Comm'r*, 166 F.3d 1294, 1296 (9th Cir. 1999)). In *Regennitter*, the Ninth Circuit held that the amount of treatment the claimant received was not necessarily inconsistent with his complaints because none of the physicians he had seen had suggested effective treatment for his pain. 166 F.3d at 1296. Here, Plaintiff testified that she always needed a cane when she left the house, but the ALJ reasonably found that she did not need a cane because she did not always use one when she went out and because her knee pain improved with physical therapy to the point that she could walk without one. The ALJ also reasonably found that Plaintiff's pain from her various conditions was well-controlled with medication.

C.    Objective Medical Evidence

Plaintiff argues that the ALJ erred in relying on a lack of objective support in rejecting her testimony about the effects of her fibromyalgia. Pl. Op. Br. 7, 8. An ALJ may discount a claimant's testimony based on a lack of support from objective medical evidence, but this may not be the sole reason. *See Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (holding that

"an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain."); *Taylor v. Berrihll*, 720 F. App'x 906, 907 (9th Cir. 2018) (explaining that a "lack of objective medical evidence cannot be the sole reason to discredit claimant's testimony," and therefore holding that the ALJ failed to provide clear and convincing reasons for discounting the claimant's testimony) (citation omitted); *Heltzel v. Comm'r of Soc. Sec. Admin.*, No. 19-1287, 2020 WL 914523, at *4 (D. Ariz. Feb. 26, 2020) (stating that "[b]ecause the ALJ's other reasons for rejecting Plaintiff's testimony were legally insufficient, a mere lack of objective support, without more, is insufficient to reject Plaintiff's testimony."). However, "[w]hen objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony." *Smartt*, 53 F.4th at 498.

Different standards apply to the evaluation of fibromyalgia because certain objective tests are not probative. The Ninth Circuit has emphasized that fibromyalgia is an unusual disease. *Revels v. Berryhill*, 874 F.3d 648, 656 (9th Cir. 2017). "What is unusual about the disease is that those suffering from it have muscle strength, sensory functions, and reflexes [that] are normal." *Id.* (internal quotations omitted). Joints will appear normal, and exams do not show objective joint swelling. *Id.* In addition, the Commissioner "will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" *Soc. Sec. Ruling, SSR 12-2P, Titles II & XVI: Evaluation of Fibromyalgia*, SSR 12-2P, 2012 WL 3104869, at *6 (S.S.A. July 25, 2012).

The ALJ recognized that Plaintiff's primary care providers consistently noted fibromyalgia as a condition under treatment. Tr. 38. He observed that while one of Plaintiff's providers found Plaintiff "tender to palpation over all trigger points," the consultative examiner

"elicited far fewer and stated that this implied the condition was mild." Tr. 38 (citing Tr. 1107, 1143). The ALJ stated that he still found fibromyalgia to be a severe impairment "in recognition of the natural course of waxing and waning symptoms." Tr. 38. This was proper. The ALJ then discounted Plaintiff's testimony about fatigue based on her self-report of symptoms through the Epworth Sleepiness Scale. Tr. 38. Thus, the ALJ did not rely on the objective medical record in discounting Plaintiff's testimony about fatigue caused by fibromyalgia. And the ALJ discounted Plaintiff's testimony about pain based on the efficacy of medication and behavioral modifications, not the objective medical record. Tr. 39. In sum, the ALJ did not err in his use of the objective medical record in assessing Plaintiff's fibromyalgia.

The ALJ discounted Plaintiff's testimony about problems with memory and concentration based on the objective testing Dr. Whitehead performed. Tr. 34. Dr. Whitehead found that Plaintiff recalled three out of three items. Tr. 1155. She also performed perfectly on the test of concentration and calculations. Tr. 1155. Plaintiff counters that this was only a short interview. Pl. Reply 8. The ALJ did not err in finding that the test results contradicted Plaintiff's allegations about difficulty with memory and concentration.

D.    Severity of Symptoms

Plaintiff argues that the ALJ erred in rejecting her testimony about the intensity of her pain. Pl. Op. Br. 6-7. The ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 37. Defendant correctly states that Plaintiff's argument misunderstands the standard. Def. Br. 11-12.

The ALJ must first determine whether a claimant suffers from a medically determinable impairment that could reasonably be expected to cause some of the symptoms the claimant alleges. 20 C.F.R. §§ 404.1529(b), 416.929(b). For symptoms such as pain and fatigue, which are difficult to quantify, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). This is because the degree of pain or fatigue "caused by a given physical impairment can vary greatly from individual to individual." *Id.* (internal quotations omitted). If the first step is met, the ALJ must then "evaluate the intensity and persistence" of those symptoms. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). In doing so, the ALJ considers all available evidence from medical and nonmedical sources, including medical records. *Id.*

The ALJ found medically determinable impairments, concluded they could cause some degree of the symptoms alleged, and considered whether evidence in the record undermined Plaintiff's testimony about the intensity of her symptoms of pain and fatigue. This was proper.

E.    Other Assignments of Error

Plaintiff argues that the ALJ erred in relying on her activities in discounting her testimony. Pl. Op. Br. 11-12. She focuses particularly on the care she provided for her grandchild. *Id.* at 11. Defendant counters that the ALJ did not reject Plaintiff's testimony based on her activities but "merely noted Plaintiff's statements regarding her activities when discussing Plaintiff's testimony." Def. Br. 13. Defendant is correct. The ALJ mentioned Plaintiff's activities, including caring for her granddaughter, in summarizing Plaintiff's testimony. Tr. 37. But the ALJ did not rely on any of the activities summarized in discounting Plaintiff's testimony;

he relied on medical evidence. Tr. 37-39. The ALJ did not err in his treatment of Plaintiff's activities.

Finally, Plaintiff argues that the ALJ rejected her credibility "in a general way" without linking the testimony he found not credible to the evidence undermining its credibility. Pl. Op. Br. 4-6. This argument lacks merit. While the ALJ must do more than merely summarize the evidence and provide a conclusion, the ALJ need not write a lengthy "dissertation[]." *Lambert, 980 F.3d at 1277*. In evaluating Plaintiff's testimony about her various impairments and their symptoms, the ALJ cited specific exhibits and stated why they contradicted or did not support aspects of Plaintiff's testimony. Tr. 37-39. The ALJ did not conclude that Plaintiff was generally not credible, and he linked the testimony he found not credible with components of the record he found to undermine that testimony.

## III.    Lay Witness Testimony

Plaintiff argues that the ALJ erred in rejecting the lay testimony of her son, Justin Day. Pl. Op. Br. 12-13. "Lay testimony as to a claimant's symptoms is competent evidence that the Secretary must take into account." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citation omitted); 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1) ("In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you."). Under the 2017 regulations, the ALJ is not "required to articulate how [they] considered evidence from nonmedical sources" using the same criteria required for the evaluation of medical sources. 20 C.F.R. §§ 404.1520c(d), 416.920c(d). Under the new regulations, however, the ALJ must still articulate their assessment of lay witness statements. *Tanya L.L. v. Comm'r Soc. Sec.*, 526 F. Supp. 3d 858, 869 (D. Or. 2021).

The ALJ must give reasons "germane to the witness" when discounting the testimony of lay witnesses. *Valentine*, 574 F.3d at 694. But the ALJ is not required "to discuss every witness's testimony on an individualized, witness-by-witness basis." *Molina*, 674 F.3d at 1114, *superseded on other grounds* by 20 C.F.R. § 404.1502(a). If the ALJ gives valid germane reasons for rejecting testimony from one witness, the ALJ may refer only to those reasons when rejecting similar testimony by a different witness. *Id*. Additionally, where "lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony," any error by the ALJ in failing to discuss the lay testimony is harmless. *Id*. at 1117, 1122.

Plaintiff's son completed a third-party function report in September 2018. Tr. 495-502. He wrote that Plaintiff lived with him. Tr. 495. He wrote that Plaintiff's conditions limited how long she could stand, sit, type on a keyboard, look at a computer screen, or read books. Tr. 495. He wrote that she was also limited in how much weight she could lift or carry. Tr. 495. Plaintiff could not run, jog, or climb stairs. Tr. 495. She had sleep issues, which "affect[ed] all aspects of her life." Tr. 495.

Plaintiff's son wrote that Plaintiff spent most of her time lying in bed or reclining in her chair. Tr. 496. She would also knit, read, or watch television. Tr. 496. She could care for her granddaughter by watching over her and preparing simple meals, and she could care for her cat. Tr. 496. Plaintiff's pain kept her from lying in certain positions for extended periods. Tr. 496. She struggled to dress and found showering physically exhausting. Tr. 496. She cut her hair short to reduce fatigue from hair care. Tr. 496. Because of the pain from standing for too long, she prepared only simple meals. Tr. 496. She did not need reminders to take care of her personal needs, and she used her phone to set reminders to take her medications. Tr. 497. Plaintiff could

load the dishwasher, tend to a small vegetable garden, do laundry, and clean the bathroom. Tr. 497. She could usually do only one or two things per day. Tr. 497. She needed help lifting heavier items. Tr. 497.

Plaintiff's son reported that Plaintiff went outside to water the lawn every day, but only went to town to a doctor's appointment or to buy groceries. Tr. 497. She could drive and go out alone. Tr. 498. She could handle finances but could not pay bills because she did not have a stable income. Tr. 498. She sometimes had trouble keeping track of her expenses. Tr. 498. Plaintiff's hobbies included watching TV and movies, reading books, crocheting, and crafting. Tr. 499. She used to be able to do them for longer periods. Tr. 499. She talked with immediate family every day, but avoided spending too long around other people. Tr. 499. She did not go to social events. Tr. 499. She got "extreme anxiety when forced to deal with confrontations of any sort." Tr. 499.

Plaintiff's son wrote that Plaintiff had limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs. Tr. 500. Plaintiff's conditions also affected her memory and concentration, ability to complete tasks and follow instructions, get along with others, and ability to use her hands. Tr. 500. She could walk about 30 to 45 minutes before needing to rest. Tr. 500. She could usually pay attention for one to two hours, depending on her pain. Tr. 500. She could follow simple written and spoken instructions well, but had trouble with complex written instructions. Tr. 500. She became anxious around authority figures. Tr. 500. She did not handle stress well and struggled with major changes in routine, but could handle minor changes. Tr. 501. She needed a cane when walking outside. Tr. 501.

The ALJ acknowledged Plaintiff's son's statement and wrote that "[h]is comments are largely duplicative of those provided by the claimant." Tr. 37. The ALJ accepted the statement

"as reflective of [the son's] observations," but concluded that "the degree of limitation alleged in the report is inconsistent with the objective evidence." Tr. 37. Plaintiff asserts that the ALJ's handling of the statement was "conclusory" and "devoid of any explanation[.]" Pl. Op. Br. 12. Plaintiff argues that finding the allegations unsupported by the objective evidence is insufficient. *Id.* at 12-13. Defendant counters that an ALJ may discount lay testimony "based on its 'inconsistency' (rather than lack of supportability) with the objective medical evidence." Def. Br. 15. Defendant also argues that Plaintiff's son described substantially the same limitations as Plaintiff, so the reasons the ALJ gave for discounting Plaintiff's testimony apply equally to Plaintiff's son's testimony. Def. Br. 15.

Defendant is right on both points. An ALJ may discount a lay witness statement based on inconsistency with the medical evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). The ALJ could properly do so here. And Plaintiff's son did not describe any limitations that Plaintiff did not include in either her function report or her hearing testimony. *Compare* Tr. 495-502 *with* Tr. 469-480. The valid bases for discounting Plaintiff's testimony apply equally well to Plaintiff's son's testimony. Any error by the ALJ in assessing the lay statement is harmless. In conclusion, the ALJ did not harmfully err in reaching his decision, and substantial evidence supports his decision. The Commissioner's decision must be affirmed.

## CONCLUSION

Based on the foregoing, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

DATED: _____January 4, 2024_____.

MARCO A. HERNANDEZ
United States District Judge